J-S01019-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1191 WDA 2025 |

Appeal from the Order Entered August 27, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000060-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: N.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1192 WDA 2025 |

Appeal from the Order Entered August 27, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000061-2024

BEFORE:   BOWES, J., PANELLA, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.:          **FILED: March 17, 2026**

C.G. ("Mother") appeals from the August 27, 2025 orders that involuntarily terminated her parental rights to her sons, L.G., born in July

_____

[*] Former Justice specially assigned to the Superior Court.

2017, and N.G., born in August 2019 (collectively, "the Children").[1] After review, we affirm.

We glean the following factual and procedural history from the certified record. The Allegheny County Office of Children, Youth and Families ("CYF" or "the Agency") received a referral on June 13, 2022, raising "overall concerns that [Mother's] mental health and drug use were impacting her ability to parent and maintain the [C]hildren's safety." N.T., 8/8/25, at 53. The court set forth the following facts giving rise to the Children's emergency custody placement on June 23, 2022.

. . .

12. On June 17, 2022, CYF intake caseworker Ramona Singleton made a home visit. She observed Mother exhibit behavior that was somewhat bizarre. For example, [N.G.] had a black eye that appeared to be a couple of days old. Mother explained that [L.G.] caused it, stating first that [L.G.] hit [N.G.] with a cell phone and then that [L.G.] hit [N.G.] with some sort of pump. Mother showed the worker a video of [L.G.] apologizing to [N.G.] and explained that she "tapes everything" because she is a good mom.

13. On June 20, 2022, Ms. Singleton returned for another home visit which raised concerns for Mother's level of supervision of the Children. Mother was seated in the home for her meeting with the worker and frequently read passages from her Bible. The Children were quite active, and the worker felt it necessary to intervene three times to alert Mother to go after the Children because they had gotten out of the family's yard.

_____

[1] By the same orders, the court additionally involuntarily terminated the parental rights of L.G.'s father, K.H., and N.G.'s father, K.B., as well as any unknown father as to N.G. Neither K.H., K.B., nor any unknown father filed an appeal or participated in the instant appeals.

- 2 -

14. On June 23, 2022, CYF caseworker Leria Felix and a CYF trainee made another home visit. Upon arrival, Mother could be heard yelling from inside the home. The caseworker was eventually able to enter the home with police assistance after Mother repeatedly slammed the door in her face. Police . . . were . . . en route to the residence prior to the caseworker's arrival.

15. Once inside the home, the caseworker observed furniture blocking doorways and an odor of animal feces and urine. There were feces on the floor in one room. [N.G.] showed the CYF trainee a magazine to a handgun. A handgun was later located in the Children's bedroom . . . .

16. Mother's behavior was escalated and erratic during this visit. Among other things, she appeared preoccupied with religion. She also made sexual comments to the police.

17. CYF obtained [emergency custody] due to the presence of the gun. The routine placement physical for the Children revealed three concerns about marks on [N.G.]'s body. First, he had more bruises than are typical for a child his age. Second, he had an oval scar on his right upper chest that is likely from a burn. Third, he had patterned lateral marks on his right forearm consistent with being grabbed with excessive force by an adult. None of these marks required any medical follow-up.

. . .

Agency Exhibits 1 & 2, Orders of Adjudication and Disposition, 7/25/22, at ¶¶ 12-17 (cleaned up); *see also* N.T., 8/8/25, at 53-55, 107. The Agency placed the Children, then almost five and three years old, in foster care. *See* N.T., 8/8/25, at 55.

The court adjudicated the Children dependent on July 25, 2022. At that time, the court provided for supervised visitation with Mother and established the Children's respective permanency goals as reunification. *See* Agency Exhibits 1 & 2, Orders of Adjudication and Disposition, 7/25/22. In

conjunction with the court's directives, the Agency instituted a service plan with goals focused on drugs and alcohol, mental health, parenting skills, visitation, housing, and addressing outstanding criminal matters. *See* N.T., 8/8/25, at 57.

Mother is diagnosed with an adjustment disorder with mixed anxiety and depressed mood, as well as, historically, cannabis abuse. *See id.* at 13-14. The record indicates that she used marijuana regularly without a valid medical marijuana card. *See id.* at 13. Moreover, Mother has an extensive criminal history. Between September of 2022, and December of 2024, she was criminally charged in four separate incidents with, *inter alia*, simple assault and resisting arrest, to which she pleaded guilty. *See* Agency Exhibit 4. Mother was sentenced to probation and, ultimately, one to three months' incarceration, which she served from December 2024, until March 2025. *See id.* Additionally, at the time of the subject hearing, multiple charges stemming from January 2024, including driving under the influence, remained pending against Mother, along with an outstanding bench warrant for her arrest. *See* N.T., 8/8/25, at 57-58.

Further, the record reveals that the Children suffer from behavioral and mental health issues and have each been diagnosed with, *inter alia*, attention deficit hyperactivity disorder ("ADHD") and an attachment disorder. *See id.* at 32-33, 72-73, 77-78, 88, 113, 116. According to Dr. Eric Bernstein, who conducted individual and interactional evaluations of the family, including

several interactional evaluations involving the Children, the Children "[have been challenging and at times aggressive, destructive, and allegedly even inappropriate with their touch." *Id.* at 29. The Children are prescribed medication and participate in individual therapy, among other programs. *See id.* At the time of the subject proceeding, L.G., then eight years old, had just completed a one-month partial hospitalization program as a result of behavior involving playing with the stove and a lighter and was expected to resume weekly individual therapy and family-based services. *See id.* at 72-73, 88.

As a result of these issues, the Children were placed in multiple foster homes throughout their dependencies. *See id.* at 28-29, 72. At the time of the subject hearing, the Children, who were eight and nearly six years old, were placed in separate foster homes, neither of which were pre-adoptive. *See id.* at 70-72, 75-77. Importantly, the Children desired to be reunified with Mother. *See id.* at 17, 24, 45, 142-43.

The court held permanency review hearings at regular intervals from November 2022, through June 2025. Mother's compliance and overall progress vacillated between moderate and minimal throughout the Children's dependency proceedings. Although she largely maintained moderate compliance and progress from January 2024, through November 2024, her adherence regressed to minimal between February 2025 and June 2025. *See* Agency Exhibits 1 & 2.

Contemporaneously, on July 2, 2024, the Agency filed petitions for the involuntary termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). The orphans' court held a hearing on August 8, 2025, at which time the Children were eight and nearly six years old, respectively.[2] The Agency presented the testimony of its caseworker, Amanda Frank, and Dr. Bernstein, who was accepted by the court as an expert in forensic psychology. Notably. Dr. Bernstein recognized that a bond exists between Mother and the Children, but specified that it is not strong. *See* N.T., 8/8/25, at 37-38. Further, Dr. Bernstein opined that to the Children would not suffer "extreme emotional consequences" if Mother's parental rights were terminated. *See id.* at 46-47. The Agency additionally proffered numerous exhibits which were admitted without objection. Mother was represented by counsel and testified on her own behalf via telephone.

By orders dated August 12, 2025, and entered on August 27, 2025, the orphans' court involuntarily terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b). On September

---

[2] Frank McWilson, Esquire, represented the Children's legal interests during the proceeding. *See* Orders, 8/16/24 (appointment orders). As such, the court complied with 23 Pa.C.S.A. § 2313(a), as interpreted by the High Court. *See In re Adoption of L.B.M.*, 161 A.3d 172, 180 (Pa. 2017) (footnote omitted). Mr. McWilson did not file a brief on behalf of the Children in this appeal; however, during the subject proceeding, he advocated for the court to deny the involuntary termination petitions. *See* N.T., 8/8/25, at 142-43. We note that the Children were not represented by a guardian *ad litem* during the hearing.

23, 2025, Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which we consolidated *sua sponte* on October 22, 2025. In response, the orphans' court filed a Rule 1925(a) opinion on October 17, 2025, referencing its reasoning placed on the record and in open court on August 12, 2025. ***See*** N.T., 8/12/25, at 6-25.

On appeal, Mother raises the following issues for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 [Pa.C.S.A. §] 2511(a)(2) and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [Children] pursuant to 23 [Pa.C.S.A. §] 2511(b)?

Mother's Brief at 8.

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-

will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's determination as to any one subsection of Section 2511(a), in addition to

Section 2511(b), in order to affirm termination. ***See In re K.R.***, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*).

We analyze the decrees involuntarily terminating Mother's parental rights to Children pursuant to Section 2511(a)(2) and (b),[3] which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

---

[3] Given our disposition relative to Section 2511(a)(2), we need not review and make no conclusions as to the orphans' court's findings with respect to Section 2511(a)(8). ***See K.R.***, 200 A.3d at 979 (observing this Court may review one subsection of Section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

- 9 -

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of Section 2511(a)(2), the party petitioning for termination must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted).  Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citation omitted).  We have long recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *Id.* (citation omitted).

In this case, Mother argues that the court abused its discretion in terminating her parental rights pursuant to Section 2511(a)(2) based on insufficiency of the evidence.  *See* Mother's Brief at 21.  Specifically, Mother asserts that she has participated in drug and alcohol and mental health treatment, as well as parenting classes.  *See id.* at 21-23.  Mother contends that her participation in these programs, specifically parenting, has been "positive," and demonstrates her ability to provide "essential parental care" to the Children.  *Id.* at 23.  We are constrained to disagree.

Here, the orphans' court determined that Mother made minimal progress in her parental skills during the three years of the Children's

- 10 -

dependencies. *See* N.T., 8/8/25, at 8-9. Mother did not acknowledge her parental deficits. *See id.* at 9-10, 12-14. In addition, the court found that Mother's drug and mental health issues and ongoing criminal activity warranted termination under Section 2511(a)(2). *See id.* at 14-18. In reviewing the evidence of record, we discern no abuse of discretion.

Dr. Bernstein conducted an interactional evaluation of L.G. and his foster care resource in May 2025, an individual evaluation of Mother in July 2025, and separate interactional evaluations of Mother and the Children in July 2025. *See* Agency Exhibit 7; N.T., 8/8/25, at 12. Significantly, he had previously conducted two joint interactional evaluations of Mother and the Children in March 2023 and October 2024, which he concluded early due to Mother's failure to garner the Children's compliance and cooperation and due to safety concerns. *See* Agency Exhibit 7 at 2; N.T., 8/8/25, at 32-33, 39, 41-43. Specifically, Dr. Bernstein explained that, during these two appointments, Mother demonstrated

> a marked inability to effectively support their needs, such as two appointments she had been excused for not having capacity to effectively support them and control them, one in which she had been repeatedly assaulted and could not thwart that behavior by her son, and in another instance the [C]hildren, she could not enlist their cooperation[.] . . .

N.T., 8/8/25, at 15; *see also id.* at 39, 42, 105, 109. He testified that Mother "has notably and consistently struggled in enforcing expectations, establishing rules, providing structure, and eliciting [a] level of compliance" from the

- 11 -

Children. *Id.* at 34. Dr. Bernstein therefore recommended that Mother participate in coached parenting.[4] *See id.* at 34.

Although Mother completed a parenting program in January 2023, Ms. Frank testified that Mother's lack of progress required her to attend an additional parenting program, which she failed to do, as well as coached visitation, in which she participated from May 2023, through November 2024, but did not successfully complete. *See id.* at 58-59. Ms. Frank recounted several instances during Mother's coached visitations where she failed to appropriately supervise the Children near the street or parking lot; where Mother appeared to be under the influence or suffering a mental health episode; and where Mother attempted to abscond with the Children, which resulted in Mother's supervised visits being suspended for three months. *See id.* at 64-69, 98-99, 102-03, 112-13. Furthermore, Ms. Frank testified that coached visitation ultimately ended as the provider "felt they could not maintain the [C]hildren's behaviors in a safe manner . . . ." *Id.* at 105. As such, as recently as June 2025, Ms. Frank expressed an intent to again refer Mother for coached visitation. *See id.* at 118.

Significantly, Ms. Frank testified that Mother denied needing parenting assistance. *See id.* at 70; *see also id.* at 92-93. Ms. Frank stated that Mother "doesn't accept [] advice" and "provides excuses" for the Children's

_____

[4] We refer to coached parenting and coached visitation interchangeably.

behaviors and her inability to manage them. *Id.* at 89. She continued, "Even when [Mother has] been prompted not only [by] myself, but the visit coach who has more knowledge than myself about parenting, [Mother] would often say that the visit coach is not qualified" to help her because the coach does not "have children, not for any other reason. . . ." *Id.* at 70. Reflective of this disavowal, Mother testified as follows when questioned by the court:

> Q. Speaking of parenting, you did a coached parenting program, is that correct?
>
> A. Yeah, . . . yes, I did all of that.
>
> Q. You did coached parenting prior to being incarcerated, right?
>
> A. Yes.
>
> Q. Did you find the coached parenting helpful?
>
> A. I don't think it's that I'm a bad parent. I think every parent could take like advice, you know, but the situation is because of my sister calling and my mother had a gun in my house and they took my children because there was a gun in my house, and my sister lied and said I was on drugs and mentally unstable, so that's why my children were removed. Coach therapy -- I think I'm a very good parent. . . .

*Id.* at 128 (cleaned up).

Additionally, as indicated, Mother was diagnosed with an adjustment disorder, as well as cannabis abuse. *See id.* at 13. Ms. Frank acknowledged Mother's engagement in and compliance with drug and alcohol and mental health treatment at times during the Children's dependency proceedings. *See id.* at 59-62, 83-84. However, Ms. Frank recounted that CYF did not have documentation of any drug and alcohol and mental health treatment from

- 13 -

Mother's incarceration in December 2024 until her reengagement just a week prior to the subject hearing. *See id.* at 62. While Mother indicated that she participated in a program while incarcerated, Ms. Frank had no corroborating information. *See id.* at 84-85, 125, 127. Moreover, Mother failed to report consistently for drug and alcohol screening. In fact, she tested five times in the year preceding the termination hearing, and four of those times the results were positive for marijuana, most recently in May 2025. *See* Agency Exhibit 4. Indeed, Dr. Bernstein testified that Mother reported marijuana use on a "weekly basis." *See* N.T., 8/8/25, at 13. Notwithstanding, Ms. Frank testified that Mother does not believe she has a drug or mental health problem, and, therefore, she does not accept any help. *See id.* at 90-93. Mother testified that she merely "smokes because she misses [her] kids." *Id.* at 123, 126-27; *see also id.* at 13, 36-37, 58, 81. Importantly, Dr. Bernstein testified that Mother's diagnoses "did not compromise in and [of] itself her ability to care for a child," yet he admitted that Mother was "healthier and better functioning" while in drug and alcohol and mental health treatment. *Id.* at 14.

Finally, as noted *supra*, Mother had an extensive criminal history, including pending charges with an outstanding bench warrant. *See id.* at 57-58; Agency Exhibit 4. She further acknowledged residing with her boyfriend in housing that was not appropriate for the Children at the time of the subject hearing. *See* N.T., 8/8/25, at 123; *see also id.* at 13, 36-37, 58, 81.

Accordingly, Ms. Frank testified that Mother was not able to care for the Children on a full-time basis. *See id.* at 78. She explained:

> My concern is that she has not made any progress in the three years that she's been involved with the [A]gency despite having several referrals to several different services to address the concerns in her court ordered goals and alleviate the need for the [C]hildren to be placed. She has not shown that she has maintained sobriety, that she's adequately addressed her mental health, that she has appropriate housing for the [C]hildren, or can parent the [C]hildren effectively and safely, and there's currently pending criminal charges with an active warrant.

*Id.* at 78.

Based on the foregoing, we discern no abuse of discretion by the orphans' court in concluding that termination pursuant to Section 2511(a)(2) is warranted. The record demonstrates that Mother's repeated and continued incapacities, including her drug and alcohol addiction, mental health issues, and continuing criminal activity, have caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. Further, the record supports that the conditions and causes of Mother's incapacities cannot or will not be remedied given the Children's placement for more than three years, and Mother's failure to acknowledge her continued incapacities. *See A.H.*, 247 A.3d at 443.

Since the record supports the orphans' court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of Section 2511(a), we now turn to a review of the court's findings pursuant to Section 2511(b), which gives "primary consideration to the developmental, physical

and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

"The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). However, our Supreme Court has concluded that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1009. A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional

consequences" or significant, irreparable harm. *Id.* at 1109-10. This Court has recognized that,

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Furthermore, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *M.E.*, 283 A.3d at 839 (cleaned up).

Here, Mother first argues that the court erred by considering Section 2511(b) inasmuch as she claims that the Agency failed to meet its evidentiary burden under Section 2511(a). *See* Mother's Brief at 25. Because we have

already concluded that the court did not abuse its discretion with respect to Section 2511(a)(2), Mother's argument fails. In addition, Mother argues that the court abused its discretion because a bond exists between her and the Children, and neither of them are in a pre-adoptive placement. *See id.* at 25-26. Mother relies upon the testimony of Dr. Bernstein that a bond existed, the severance of which would negatively impact the Children. *See id.* at 25. For the reasons that follow, Mother is not entitled to relief.

In determining that termination of Mother's parental rights served the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b), the orphans' court emphasized the Children's need for permanency. *See* N.T., 8/12/25, at 18-19, 24-25. While recognizing that the Children shared a bond with Mother, the court relied on the testimony of Dr. Bernstein that any negative impact by terminating Mother's parental rights is outweighed by the Children's need for permanency. *See id.* at 21-22. Also important to the court was Dr. Bernstein's opinion that termination would not result in "extreme" negative impact or interfere with the Children's development. *Id.* at 22. Dr. Bernstein elaborated on the reasons he found that termination is not outweigh by the bond between Mother and the Children. Upon review, we discern no abuse of discretion.

Dr. Bernstein testified that the bond that exists between the Children and Mother has been diminished "by periods of absence related to [Mother's] legal difficulties and/or other circumstances in which she has either been

compromised in attending full visits or received increased scrutiny as to her judgment and/or behavior[.]" *See* N.T., 8/8/25, at 20. As such, he opined that the Children's bond with Mother is not strong. *See id.* at 37-38. It follows that Dr. Bernstein declined to classify any negative consequences to the Children as extreme should Mother's parental rights be terminated. *See id.* at 46-47. Upon inquiry by the court, he testified, as follows:

> THE COURT: . . . Finally, you have spoken about the potential impact on the Children of termination of their mother's rights, and you spoke about how you would predict that they would experience a negative impact of that, which I understand. The appellate courts have talked about this question at times, frequently actually, as asking whether a child would suffer extreme emotional consequences if their parents' rights were terminated, and I wondered if you could give me any insight into how negative the impact on them would be?
>
> . . .
>
> DR. BERNSTEIN: . . . **I would not characterize the potential effect upon the children as extreme**, rather, that there would be an impact and that they would feel the absence of their mother, but . . . it would not rise to the level of however they would define extreme that I would -- **I would not view it as an extreme**.

*Id.* at 46-47 (emphasis added). He further opined that the Children would not suffer irreparable harm:

> Q. Dr. Bernstein, is it the case that if you are able to tell at all, ceasing contact with Mother would cause such pain as to cause the Children difficulty in their emotional or psychological development?
>
> A. Ultimately of course no one is in a position to know with any sense of certainty, but based upon everything that I have reviewed and observed, no, **it is not my determination that the Children would be irreparably damaged, emotionally, physically, psychologically harmed** in such a way that they

could not otherwise function with the benefit of receiving a supportive home environment, as well as any support services that can be provided to help them through this transition, if that was the court's decision.

*Id.* at 48 (emphasis added). Dr. Bernstein agreed that the Children's need for permanency would outweigh any negative impact that terminating Mother's parental rights would have on them. *See id.* at 21-22.

Likewise, Ms. Frank expressed the Agency's support for termination of Mother's parental rights due to the Children's need for permanency. *See id.* at 79. She testified that "termination will allow the [C]hildren to have a chance of obtaining permanency and stability. Obviously[,] permanency is necessary for children to have that stability, security, consistency, and have a better potential of developing healthy, emotional, psychological and social development." *Id.*

In addition, Ms. Frank testified that Mother has at times, expressed her disapproval of the recommended therapeutic treatment for the Children. *See id.* at 78-79, 89. In contrast, the Children's foster care parents ensure that the Children receive all of the necessary services, and there has been improvement in their behavior as a result. *See id.* at 73-74, 78-79, 88, 114-16.

Thus, the record amply demonstrates that Mother and the Children do not share a necessary and beneficial relationship. *See K.T.*, 296 A.3d at 1109-10, 1113. While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude

termination of parental rights. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted). Based upon our review of the record, we discern no abuse of discretion in the court's conclusion that the Children's developmental, physical, and emotional needs and welfare will be served by the termination of Mother's parental rights pursuant to Section 2511(b).[5]

Accordingly, we affirm the orders.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

3/17/2026

---

[5] As stated above, Frank McWilson, Esquire, represented the Children's legal interests during the proceeding, and advocated for the court to deny the involuntary termination petitions. However, since Attorney McWilson did not file a brief in this appeal, we do not have the benefit of his position or reasoning following the filing of the orders dated August 12, 2025, and entered on August 27, 2025, by the orphans' court involuntarily terminating Mother's parental rights to the Children.